UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

JAMES A. BILSKI and     )
CHARLES M. HERALD,     )
            )
    Plaintiffs,      )    Civil Action No. 5: 16-322-DCR
            )
V.            )
            )
RYAN D. MCCARTHY, Acting   )   **MEMORANDUM OPINION**
Secretary, Department of the Army, et al.[1]   )     **AND ORDER**
            )
    Defendants.      )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

    This matter is pending for consideration of the defendant's motion to dismiss a portion of the claims contained in the Complaint. [Record No. 6] For the reasons described herein, the motion will be granted, in part, and denied, in part.

## I.  Background

    The Blue Grass Army Depot ("BGAD," or "the Depot"), located in Richmond, Kentucky, supplies arms and munitions to Army installations in the southeastern United States—approximately 20-25% of the United States Army. [Record No. 6-1 at 4] The Depot stores and maintains both chemical and conventional munitions, including "sensitive Category I and II munitions" such as "ready-to-fire" Stinger missiles. [*Id.*] The Depot is the primary supplier of Arms, Ammunition & Explosives ("AA&E") for Army special forces worldwide.

---

[1]   As of August 2, 2017, Ryan D. McCarthy is the Acting Secretary of the Army and is substituted as the defendant in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[*Id.*]  In accordance with its mission, the Depot operates 24 hours a day, 365 days a year, ready on short notice to supply Army forces heading into combat.  [*Id.*]

### a.    Electronics Mechanics Positions

Plaintiffs James Bilski and Charles Herald were formerly employed as Electronics Mechanics at BGAD.  [Record No. 1 at ¶16]  Their duties included "installation, maintenance, modification, and repair" of the classified Intrusion Detection System ("IDS") that protects the storage facilities ("igloos") for the Category I and II munitions and explosives.  [Record No. 6-1 at 2-4]  The IDS protects not only the munitions themselves (which sometimes contain classified components) but also "BGAD's systems for communicating, storing and discussing classified information, which can include materials such as the emergency operating plans for theft and the recovery of chemical weapons and the plans for the IDS protecting AA&E and chemical weapons."  [*Id.* at 4-5]  Details regarding "the exact numbers, specific place, and manner of storing and securing AA&E," which includes the IDS, are sensitive and/or classified.  [*Id.* at 5]

As a condition of their employment (that is, for their specific duties), the plaintiffs were required to possess security clearances and be qualified under the Army's AA&E Program. [*Id.* at 5]  Army regulations dictate that

> Commanders/directors [] be selective in assigning personnel to duties involving control of all categories of AA&E.  Only personnel who are mature and stable and have shown a willingness and capability to perform assigned tasks in a dependable manner will be assigned to duties[] which involve responsibility for the control, accountability, and shipment of all categories of AA&E.

[Record No. 6-1 at 5-6 (quoting Army Regulation ("AR") 190-11, ¶ 2-11)]  Accordingly, individuals under consideration for taking part in the AA&E program "are required to undergo a rigorous security screening designed to provide the commander reasonable assurance that

personnel with character traits that raise significant doubt as to their honesty and stability are not afforded access." [*Id.* at 6]  The security screening for civilian employees includes, at a minimum, "(1) [a] personal interview of the individual conducted by his or her immediate commander or supervisor; (2) a personnel records check; (3) a law enforcement/security records check; and (4) a records check of local civilian law enforcement agencies, if permitted by law." [*Id.*]  Once approved, employees are required to undergo annual medical evaluations and are subject to psychological screenings when deemed necessary. [*Id.*]  The security check for AA&E employees is repeated every three years. [*Id.* (citing AR 190-11, ¶ 2-11.e)]

Grounds for removal from the AA&E program include drug or alcohol abuse, mental instability, and "any other character trait, a record of conduct, or adverse information, which, in the commander's/director's/manager's judgment, would be prejudicial to reliability or trustworthiness." [*Id.* (citing AR 190-11, ¶ 2-11.d)]  Defendants suggest that the touchstone for removal is "when doubt exists as to their reliability and trustworthiness." [*Id.* (citing AR 190-11, ¶ 2-11.b(4))]  Plaintiffs Bilski and Howard underwent AA&E screening as recently as April 2013 and were approved. [*Id.* at 6-7]

### b. Promotion Denial

Prior to March 5, 2014, Bilski applied for a promotion to the position of Electronic Security Assessment Officer. [Record No. 1 at ¶¶19-20, 22]  He interviewed for the position on March 5, 2014, but was not selected for the promotion when a decision was made the following month. [*Id.*; Record No. 6-1 at 2]  Bilski was over 40 years of age at the time he was not selected for the promotion. [Record No. 1 at ¶25]  The individual selected for the position was under 40 years of age. [*Id.* at ¶24]  At the time, Bilski had over 20 years' experience in federal service, while the individual selected for the promotion had over six

years' experience.  [*Id.* at ¶¶26-27]  Moreover, Bilski had served more than 13 years as an Electronics Mechanic and/or Electronics/Mechanical Mechanic, whereas the individual selected for the promotion had served just under six years as an Electronics Mechanic.  [*Id.*]

### c.    EEO Complaint

Herald overheard a conversation in March 2014 between two supervisory individuals stating that they wished to go with the "younger guy" for the Electronic Security Assessment Officer position because the other individual (Bilski) was "close to retirement."  [*Id.* at ¶28] Herald informed Bilski of what he had heard and Bilski proceeded to file a formal complaint of promotion non-selection with the Department of the Army.  [*Id.* at ¶29, 31]  Herald, who provided a witness statement in June 2014 in support of Bilski's complaint, later filed his own complaint alleging retaliation.  [*Id.* at ¶32]

The plaintiffs allege that they experienced "significant and persistent retaliation in the form of reassignments, suspensions without pay, and criminal investigation" as a result of their complaints.  [*Id.* at ¶34]  As one example, in mid-November 2014, Bilski witnessed the official with whom he had interviewed for the promotion "pound his fist on a truck making a loud noise in an attempt to intimidate [him]."  [*Id.* at 35]  On April 22, 2015, Bilski was detailed to the Directorate of Public Works, with no reason given, and was required to surrender his keys and credentials to the restricted areas, including his password for the IDS computer system. [*Id.* at 36]  On April 29, 2015, Herald was likewise reassigned to the Directorate of Public Works, until an "AR 190-11 Chapter 2" inquiry into his reliability and trustworthiness could be performed.  [*Id.* at ¶38]

### d.     Joint Munitions Command Assessment

Defendant Secretary of the Army ("the Secretary" or "the Army") tells a different story, providing a non-retaliatory reasons for the plaintiffs' reassignments. According to the Secretary, the Joint Munitions Command ("JMC"), which oversees BGAD, "conducts periodic assessments known as the Program/Process Evaluation to ensure the security of all sensitive categorized AA&E in accordance with Army Regulation 190-11." [Record No. 6-1 at 7] In April 2015, a JMC inspector found that IDS inspection/testing (for which the plaintiffs were responsible) was not being conducted properly on the Category I and II munitions igloos, as required by AR 190-11, ¶ 3-6m. [*Id.*] The inspector also found that inspection documentation was not being maintained per installation policy. [*Id.*] Accordingly, "the IDS Maintenance Section failed the periodic JMC program evaluation." [*Id.*] The Secretary asserts that the failed assessment is the reason Bilski and Herald were suspended from their duties as Electronics Mechanics. [*Id.*] They were temporarily detailed to non-AA&E Public Works positions "until an AR 190-11, Chapter 2, inquiry into their reliability and trustworthiness could be completed." [*Id.*]

### e.     Internal Investigation

An internal investigation (or AR 190-11, Chapter 2, inquiry) thereafter commenced. Less than two months after Bilski and Herald's reassignment, the investigation concluded that the plaintiffs had

> failed to conduct sufficient preventative maintenance check[s] in a timely manner on alarmed igloos as required by AR 190-11; DES SOP #11 and supervisor memorandums. Records show a pattern of Mr. Bilski and Mr. Herald delaying preventative maintenance checks to the end of the six month cycles and failing to complete all required preventative maintenance checks within the six month cycles as required. Mr. Bilski and Mr. Herald were unable to provide any documentation to account for time in the performance of their duties. The

> IDS preventative maintenance checks were assessed as non-compliant with AR 190-11 in a JMC Process Evaluation completed April 22, 2015. Inspector found CAT I and II igloo IDS inspections/testing not being conducted per AR 190-11 CH 3 para 3-5m. The IDS preventative maintenance inspection/documentation paperwork was not maintained per installation policy.

[Record No. 6-1 at 8 (quoting Exh. I "Investigative Summary dated June 10, 2015")]

Bilski and Herald were formally removed from the AA&E program in accordance with AR 190-11, ¶ 2-11(d)(7) on July 22, 2015. [*Id.*] The stated reason for their removal was that they were "considered prejudicial to reliability and trustworthiness." Further, they would "be denied access in the restricted/AA&E areas based on [their] records of conduct and adverse information substantiated from the inquiry." [*Id.*]

Five days later, Bilski was notified that the Director of Emergency Services had proposed his outright removal from federal service. [*Id.* at 42; *see also* Record No. 6-1 at 7] The Director recommended that Bilski and Herald be removed from federal service for

> (1) failing to meet a condition of employment based on their removal from the AA&E program; (2) failing to observe written regulations and procedures where safety of persons or property is endangered for failing to inspect and test the IDS systems in category I and II igloos; and (3) delay in carrying out instructions due to a pattern of delay in conducting preventative maintenance until the end of the inspection cycle.

[Record No. 6-1 at 9] Plaintiffs responded to the recommended removal both orally in writing. [*Id.*] Thereafter, the BGAD Deputy Commander sustained the charges against the plaintiffs, but "determined that based on their prior performance and absence of prior discipline, [Bilski and Herald] had the potential for rehabilitation in positions not involved with AA&E." [*Id.*] The Deputy Commander mitigated the plaintiffs' proposed removal "to a 10-day suspension with reassignment to duties not involving access to AA&E and more direct supervision." [*Id.*]

The Deputy Commander met with Bilski and Herald on September 2, 2015, before making his final decision to mitigate the plaintiffs' proposed removal to a ten-day suspension. [Record No. 1 at ¶44]  According to the plaintiffs, the Deputy Commander proposed a "Negotiated Settlement Agreement" whereby, if Bilski and Herald would drop their EEO and Merit System Protection Board complaints, their proposed termination would be reduced to a "letter of concern."  [*Id.*]  According to plaintiffs, if they refused, they would receive a letter of reprimand plus 3-10 days without pay, and would not be eligible for approximately $1,000.00 at the end of the year.  [*Id*; Record No. 7 at 3-5]  The plaintiffs did not agree to the negotiated settlement.  [*Id.*]  The Deputy Commander later speculated that the reason for not agreeing to the settlement agreement was that they had outstanding attorney's fees, for which the plaintiffs could not be compensated under the agreement.  [*See* Record No. 7 at 3-5.]

On or about September 21, 2015, Bilski and Herald received their ten-day suspension without pay, which took place from September 28, 2015, through October 7, 2015.  [Record No. 1 at ¶45]  The Deputy Commander acknowledged during a later EEO investigation that he discussed a negotiated settlement agreement with the plaintiffs.  [Record No. 7 at 4-5]  However, he denies that he retaliated against them.  [*Id.* at 3]

### f.  Criminal Investigation and Revocation of Access to BGAD

The ten-day suspension was not the end of Bilski and Herald's troubles.  Following their removal from the AA&E program, a contractor was hired to perform the IDS maintenance.  [Record No. 6-1 at 9]  The contractor discovered "tampering with the alarms" in three locations.  [*Id.*]  According to the Secretary, someone had "intentionally wired resistors to stop communication between the igloos and the security desk, and a 'defeat key' caused the secure/access switch to remain secure at all times."  [*Id.* at 9-10]  The Federal Bureau of

Investigation and the Army's Fort Knox Criminal Investigation Division ("CID") were notified. [*Id.* at 10] An investigation was opened by Fort Knox CID on October 27, 2015, with a report issued on November 19, 2015. [*Id.*] The report found that "probable cause existed to believe Mr. Herald and Mr. Bilski committed the offense of Wrongful Damage to Government Property (Willful/Negligent) when they failed to conduct maintenance of critical storage facilities and bypassed the alarms by installing 'defeat keys,' which fooled the Intrusion Detection System to report the facilities were secured perpetually." [*Id.* (quoting November 15, 2015 Report)]

Bilski and Herald's access to BGAD was revoked on November 24, 2015. [*Id.*] They were notified that the criminal investigation would be referred to the United States' Attorney's Office for possible criminal prosecution. [*Id.* (quoting removal memoranda)] Their notifications, received from the Commander of BGAD, concluded "[y]our actions pose a bona fide risk to Government property and interests. Consequently, I am exercising my authority to bar you from entering Blue Grass Army Depot property for any reason." [*Id.*] The Deputy Commander recommended on the same day their indefinite suspension from federal service. [*Id.*] Plaintiffs received an opportunity to respond to the suspension, both orally and in writing. [*Id.* at 11] The BGAD Commander issued a decision on January 14, 2016, finally and indefinitely suspending the plaintiff from federal service. [*Id.*]

### g. Prosecution Declined

On August 22, 2016, the United States Attorney's Office for the Eastern District of Kentucky notified the plaintiffs that they would not be pursuing criminal charge because the government "[did] not believe there [was] sufficient evidence to prove criminal conduct beyond a reasonable doubt." [Record No. 6-1 at 11 (quoting August 22, 2016, letter)] The

letter noted, however, that the evidence indicated that "Mr. Bilski and Mr. Herald likely failed to follow governing regulations, procedures, and/or protocols in discharging their duties, and that their conduct likely undermined the integrity of the security system protecting the Blue Grass Army Depot's munitions and other inventory." [*Id.*] The letter stated that the closure of the investigation did not preclude its being reopened and charges being brought at a later date. [Record No. 6-25 at 2] Moreover, the U.S. Attorney's office did not express any opinion regarding other consequences Bilski and Herald may face, including termination of employment. [*Id.*]

## II. Procedural History

The plaintiffs promptly filed suit following receipt of the U.S. Attorney's letter. [Record No. 1] The Verified Complaint names as defendants the Secretary of the Army, BGAD Commander Lee G. Hudson, Deputy Commander Stephen L. Sharp, and BGAD employees Christopher L. Willoughby and Donald McKeehan. [*Id.*] Count I alleges age discrimination against Plaintiff Bilski under the Age Discrimination Employment in Act of 1967. [*Id.* at ¶¶ 8 and 56] Count II asserts claims of unlawful retaliation against both plaintiffs based upon their ten-day suspension without pay, alleged abuse of the criminal justice system, and the plaintiffs' removal from federal service. [*Id.* at ¶63] The defendants seek compensatory damages, lost wages in the form of past and future earnings, injunctive relief in the form of reinstatement and promotion, and attorney's fees. [*Id.* at 14-15]

The United States Department of the Army timely filed a motion to dismiss, in part, on behalf of all defendants on November 14, 2016. [Record No. 6] The Army first asserts that the only proper defendant in this action is the Secretary of the Army in his official capacity. [Record No. 6-1 at 12-13] The Army next argues that Count II (alleging retaliation) should be

dismissed under Rule 12(b)(1) for lack of jurisdiction, based on the doctrine of non-justiciability espoused in *Dep't of the Navy v. Egan*, 484 U.S. 518 (1988). [*Id.* at 13-18] Finally, the Army contends that compensatory damages and a jury trial are not available for age discrimination claims. [*Id.* at 18] Accordingly, the Army does not contest the suit going forward regarding Bilksi's age discrimination claim.

The plaintiffs agree with dismissal of the four individually-named defendants. [Record No. 7 at 2] They also agree that "their claim for embarrassment, humiliation and mental anguish damages should be dismissed."[2] [*Id.*] However, the plaintiffs' dispute the non-justiciability argument, suggesting instead that because the record plainly shows retaliatory motive as the basis for the Army's actions, the matter is justiciable. Finally, the plaintiffs cite caselaw to support their proposition that a jury trial remains available.

The plaintiffs' were granted permission to file supplemental authority, pointing the Court to the Sixth Circuit's recent decision in *Hale v. Johnson*, 845 F.3d 224 (6th Cir. 2016), which discussed and declined to apply the *Egan* doctrine to a suit under the Americans with Disabilities Act. [Record Nos. 9 and 10] The Army thereafter filed a supplemental reply, suggesting that *Hale* favors its position. [Record No. 11]

### III.    Discussion

### a.    Justiciability of Count II

The Supreme Court held in *Dep't of the Navy v. Egan*, 484 U.S. 518 (1988), that decisions regarding security clearances are reserved to the Executive Branch by Article II of

---

[2]    The Verified Complaint specifically seeks as relief "Compensatory damages including lost wages, past and future." [Record No. 1 at 14] The Court takes the plaintiffs as agreeing to retain a damages claim only for past and future lost wages.

the Constitution. The *Egan* Court "concluded that the 'sensitive and inherently discretionary judgment call' required to make predictive judgments about an individual's likelihood of compromising sensitive information is best left to those with an expertise in rendering judgments based on this 'inexact science.'" *Hale v. Johnson*, 845 F.3d 224, 230 (6th Cir. 2016) (quoting *Egan*, 484 U.S. at 524-30). Courts have since struggled to agree on the exact scope of the *Egan* doctrine, particularly the extent to which it applies beyond the narrow issue of security clearances. *Compare Kaplan v. Conyers*, 733 F.3d 1148 (Fed. Cir. 2013) (en banc) (finding non-reviewable the Defense Department's determinations concerning eligibility of employees to occupy "sensitive" positions, regardless of whether positions required access to classified information); *Foote v. Moniz*, 751 F.3d 656 (D.C. Cir. 2014) (finding non-justiciable the Department of Energy's decision to certify individuals for its "Human Reliability Program," based upon similarity to security clearance decisions) *with Toy v. Holder*, 714 F.3d 881 (5th Cir. 2013) (declining to apply *Egan* to Federal Bureau of Investigation's decision to revoke a contract employee's access to its office building, given the lack of detailed process or considered decision making involved).

The Sixth Circuit considered *Egan*'s scope (i.e., beyond security clearances) for the first time in *Hale v. Johnson*, 845 F.3d 224 (6th Cir. 2016). The plaintiff was a former security guard for the Tennessee Valley Authority who was terminated from his position after failing a pulmonary function test. *Id.* at 226, 230. The Court declined to define *Egan's* precise scope, instead holding narrowly that *Egan* does not apply to judgments regarding physical fitness. *Id.* at 230. The Court, however, casted a skeptical eye towards the expansive readings of *Egan*. The Court opined that its limited ruling prevents it from "slipping into the untenable position

wherein [courts] are precluded from reviewing any federal agency's employment decision so long as it is made in the name of national security." *Id.* at 231.

*Hale* also noted *Egan*'s emphasis on the importance of "executive branch control of national-security *information*" as distinct from "general national security concerns." *Id.* at 230. *Hale* distinguished *Egan*, noting that the question of a plaintiff's physical ability to guard a nuclear plant "is based on hard science" and such questions have "traditionally been reviewed by courts and administrative agencies." *Id.* Such determinations are unlike judgments based on an individual's "propensity to disclose classified information," which requires predictive judgment less amenable to review by "an outside nonexpert body." *Id.* (quoting *Egan* 484 U.S. at 529).

The Secretary seeks Rule 12(b)(1) dismissal of Count II of the Verified Complaint, which alleges unlawful retaliation. Applying *Hale* and taking into consideration authority from the other circuits, the Court will grant the defendant's Rule 12(b)(1) motion, in part. Specifically, the Court finds that the Army's decision to remove the plaintiffs from the AA&E program, *which includes access to both classified and sensitive national-security information*, must be reserved to the Executive Branch. However, the Court denies the Rule 12(b)(1) motion with respect to the plaintiffs' suspensions without pay and removal from federal service. The Secretary has not shown that the plaintiffs' reassigned positions *outside* the AA&E program were "sensitive" positions. That is, even if the more expansive reading of *Egan* adopted by the Federal Circuit in *Kaplan*, 733 F.3d 1148, were binding on this Court, the facts presented would not allow its application. Without a sufficient factual basis to support the sensitive nature of the plaintiffs' reassigned positions, or more elaboration on the predictive

judgment necessary for the ten-day suspension, indefinite suspension and removal decisions, the Court cannot find that the latter decisions are reserved to the Executive Branch.

The Secretary argues that "the decisions to reassign, suspend, and ultimately revoke Plaintiffs' access to these facilities, after an investigation concluded that their conduct cast doubt on their reliability and trustworthiness, are exactly the type of predictive judgments committed to the discretion of officials of the Executive Branch based on considerations of national security." [Record No. 6-1 at 3] The Court agrees that the decision to reassign the plaintiffs away from the AA&E program is a predictive judgment committed to the executive branch.[3] While it was not a traditional "security clearance" decision as in *Egan*, it was strongly analogous if not more critical. A security clearance is a pre-requisite to certification into the AA&E program, but more is required. The sensitivity of the AA&E program requires additional screening and inquiry into an individual's reliability and trustworthiness. That additional screening is part of a formal process with tri-yearly reauthorizations. In short, the reliability and trustworthiness inquiry required for participation in the AA&E program is no less arbitrary than a decision to grant a security clearance, but instead is more tailored to the particularly sensitive work with dangerous weaponry.

Army regulations dictate that "[o]nly personnel who are mature and stable and have shown a willingness and capability to perform assigned tasks in a dependable manner will be assigned to duties, which involve responsibility for the control, accountability, and shipment of all categories of AA&E." [Record No. 6-1 at 5 (quoting AR 190-11, ¶ 2-11)] Determining "willingness and capability to perform assigned tasks in a dependable manner" requires

---

[3] This includes the decision to temporarily "suspend" the plaintiffs from the AA&E program while the initial inquiry was underway.

predictive judgment, and the predictive judgment is directly tied to national security (not to mention the physical security of the community and region surrounding the Blue Grass Army Depot). To that end, the AA&E program's physical security standards are "designed to safeguard personnel, property, and operations; to prevent unauthorized access to equipment, facilities, materiel, and information; and to protect against espionage, terrorism, sabotage, damage, misuse, and theft." [Record No. 6-1 at 5(quoting AR 190-11, Glossary, Section II (defining "physical security"))]. Physical security depends on willing and dependable individuals.

Based upon the JMC evaluation failure, plaintiffs were originally -- but only temporarily -- suspended from AA&E duty (in the Directorate of Emergency Services) and reassigned to the Directorate of Public Works, to investigate their reliability and trustworthiness [Record No. 6-1 at 7; Record Nos. 6-8 and 6-9 ("Suspension of Duty and Temporary Detail" letters dated April 29, 2015)]. On July 22, 2015, based upon the results of the investigative inquiry, Herald and Bilski were formally removed from the AA&E program by Robert Nelson, Director of Emergency Services. [See Record Nos. 6-11 and 6-12 ("Removal from AA&E Program" letters dated July 22, 2015).] These decisions (i.e., the temporary suspension of duty and reassignment) and the final removal from the AA&E program are non-justiciable based upon the *Egan* doctrine.

It appears that Bilski and Herald maintained their temporary duty assignments following their formal removal from the AA&E program, working as Electronics Mechanics in the Directorate of Emergency Services. However, on July 27, 2015, Emergency Services Director Nelson proposed that Bilski and Herald be removed both from positions as Electronic Mechanics and from federal service at the Blue Grass Army Depot. [Record No. 6-1 at 9;

Record Nos. 6-13 and 6-14 ("Proposed Removal" letters dated July 27, 2015)]  The stated reasons were

> (1) failing to meet a condition of employment based on their removal from the AA&E program; (2) failing to observe written regulations and procedures where safety of persons or property is endangered for failing to inspect and test the IDS systems in category I and II igloos; and (3) delay in carrying out instructions due to a pattern of delay in conducting preventative maintenance until the end of the inspection cycle.

[*Id.*]

Plaintiffs had an opportunity to respond (orally and in writing) to this recommendation, and BGAD Deputy Commander Stephen Sharp was the final decision maker.  [Record No. 6-1 at 9]  Deputy Commander Sharp sustained the charges against the plaintiffs.  [*Id.*; Record Nos. 6-15 and 6-16 (September 17, 2015, Notices of 10-Day Suspension)]  However, the Deputy Commander declined to remove them from federal service.  Instead, he found that based on "their prior performance and absence of prior discipline" the plaintiffs "had the potential for rehabilitation in positions not involved with AA&E."  [*Id.*]  The Deputy Commander mitigated their proposed removals to "a 10-day suspension, along with reassignment to duties not involving access to AA&E and more direct supervision" and the plaintiffs were suspended from their employment at BGAD for ten days without pay.  [Record No. 1 at ¶45; Record Nos. 6-15 and 6-16]  Upon return, Bilski was reassigned to a non-AA&E position as a Telecommunications Mechanic, and Herald was reassigned to a non-AA&E position as a Production Maintenance Mechanic.  [Record Nos. 6-15 and 6-16]

There are two parts to Sharp's decision: the ten-day suspension and reassignment. Plaintiffs assert that, based on a proposed settlement agreement (whereby if plaintiffs would drop their EEO complaints, the suspensions without pay would be reduced to "letters of

concern"), their suspension was clearly retaliatory, and so *Egan* does not apply. Without commenting on the import or evidentiary value of the proposed settlement agreement[4], the Court agrees that *Egan* does not bar litigation of the decision to suspend the plaintiffs. That decision appears to be punitive, based on failure to meet conditions of employment. There is no indication that this decision was based upon the sort of "predictive judgment" that must be left to Executive Branch.

On the other hand, inasmuch as Deputy Commander Sharp's decision affirmed the plaintiffs removal from the AA&E program (which necessitated a reassignment), that decision *is* shielded from judicial scrutiny. Whether the failures to meet the condition of employment compromised the plaintiff's demonstrated "willingness and capability to perform assigned tasks in a dependable manner," while perhaps not a difficult question, is one that must be reserved for the Executive Branch under the *Egan* doctrine. Plaintiff's actions may well have compromised the integrity of the AA&E program. The extent to which their actions did so, and therefore warrant the plaintiffs' dismissal from the program, is not a determination well-suited for judicial adjudication. The courts are not well-suited to "determine what constitutes an acceptable margin of error in assessing the potential risk" posed by the plaintiffs' actions. *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) The AA&E program contains not only classified information but also sophisticated weaponry that, in the wrong hands, would pose an immediate risk to the security of the nation and its citizens. Protection of these assets must be "committed to the broad discretion of the agency responsible" which includes "broad discretion to determine who may have access to it." *Id.*

---

[4]     The defendant asserts that, as a settlement offer, Sharp's proposal would be inadmissible at trial.

This distinction between access to the AA&E program and suspension for a violation of a condition of employment is not without difficulty. The line-drawing dilemma comes into focus when considering the final issue: the plaintiffs' bar from BGAD and removal from federal service. The notification letter barring the defendants from BGAD stated:

> You are under investigation by the U.S. Army Criminal Investigation Division for Wrongful Damage to Government Property which will be referred to the U.S. Attorney for possible criminal prosecution. Your actions pose a bona fide risk to Government property and interests. Consequently, I am exercising my authority to bar you from entering Blue Grass Army Depot property for any reason.

[Record No. 6-1 at 10 (quoting Record Nos. 6-19 and 6-20 (notification letters dated November 24, 2015)]

The plaintiffs were indefinitely suspended from federal service on January 14, 2016. [*See* Record No. 6-1 at 10-11.] The suspensions were based on the ongoing criminal investigation, which included the plaintiffs' alleged installation of "defeat keys" in igloo security systems. [*See* Record Nos. 6-21 and 6-22 (Notices of Proposed Indefinite Suspension dated November 24, 2015); Record Nos. 6-23 and 6-24 (Notices of Decision – Indefinite Suspension, dated January 14, 2016).] Bilski admitted to having installed defeat keys (although he denied that they compromised the security of the igloos), while Herald denied having personally done so (although evidence suggested his presence during and knowledge of their installation). [Record No. 6-23 at ¶2 (Bilski notice); Record No. 6-24 at ¶2 (Herald notice)]

The decision to bar the plaintiffs from BGAD (which was a predicate to their indefinite suspension) was (at least allegedly) based upon the security threat posed by the plaintiffs'

actions. If the Court were to conduct the *McDonnell-Douglas* burden shifting analysis[5] to consider whether this reason were pretextual, it would require evaluation of the stated reason— security concerns.[6] Alas, such is unavoidable, and *Egan* did not portend to reserve for the Executive Branch any and all decisions with security implications. *See Hart,* 845 F.3d at 230 (distinguishing between national-security *information* and national-security *concerns*). And such a requirement does not inhibit the Court's ability to remain deferential to an executive branch department's assessment of the nature and degree of security risk posed by the plaintiffs' actions or continued presence at the Depot. For example, the Court may consider whether, in fact, "defeat keys" were installed, and whether the plaintiffs' were responsible, but may defer to the Army on the question of whether the defeat keys posed a legitimate security concern.[7]

As a result of the foregoing, the Court declines, on the present motion, to apply *Egan* to the suspension and final removal decisions. The Secretary conflates the decision to remove Bilski and Herald from the AA&E program with the decisions to suspend them for ten days, later bar them from BGAD, and eventually remove them from federal employment. But these were separate decisions. The plaintiffs' alleged conduct (creating default keys) may well have warranted their suspensions and removal from federal service. However, the Court must

---

[5]     *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

[6]     The same complication will arise in evaluating the propriety of a ten-day suspension, inasmuch as the extent of the disciplinary action would be presumed proportional to the abrogation of the plaintiffs' job responsibilities, which is indelibly linked to security concerns.

[7]     Interestingly, the notices of indefinite suspension stated in part "[p]ease be advised this action is not disciplinary in nature, but meant to allow for investigations and criminal proceedings to run their course." [Record Nos. 6-23 and 6-24 at ¶5 and ¶5(c)]

separate the merits questions from the determination of non-justiciability. To warrant application of *Egan*, the defendants must show that *each* of the relevant decisions (removal from AA&E, ten-day suspension, indefinite suspension, and removal from federal service) involved "predictive judgment about an individual's likelihood of compromising sensitive information." The Court does not doubt that the decision to allow any individual onto the BGAD grounds involves some measure of predictive judgment.

The *Egan* case involved predictive judgment *about propensity to divulge sensitive or classified information*. The motion to dismiss does not address whether the plaintiffs' *reassigned* positions presented a concern about compromising sensitive information. [*See* Record No. 11 at 5, 7 ("the Army's determination that Plaintiffs were a security risk *and should not have access to AA&E* reflects precisely the sort of 'sensitive, inherently discretionary judgment call' about national security that Article II commits to the 'broad discretion of the responsible executive branch agency.'") (quoting *Egan*, 484 U.S. at 527-29) (emphasis added).] Moreover, while the plaintiffs' security clearances were ultimately revoked, the Secretary's motion does not address whether the clearances were necessary for the reassigned positions. Instead, the materials filed in support of the motion suggest that security clearances were only required for the AA&E program. [*See* Record No. 6-2 at ¶7 ("As electronic mechanics in the AA&E program at BGAD, Mr. Bilski and Mr. Herald were required to have a security clearance and to obtain and maintain certification under the program.").]

*Egan* squarely applies to decisions to revoke security clearances, and as the defendants argue, the timeline in this case does not, in and of itself, bar application of *Egan*.[8] [Record No.

---

[8] It is possible that a removal from duty could occur prior to the formal revocation of a security clearance, although the latter would necessitate the former.

11 at 8 (quoting *Bacerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996)]   However, without indication of whether the security clearances were necessary for the plaintiffs' continued employment in their reassigned positions, the Court is without a basis to determine whether *Egan* should apply to the plaintiffs' removal from federal service.   The Secretary repeatedly argues that the "predictive judgment" exercised by BGAD command resulted in the plaintiffs' "being denied access in the restricted AA&E areas."  [Record No. 11 at 10]  Such a substantial security risk, the Court little doubts, may warrant an individual's removal from federal service wholesale.   But the Army cannot assert non-justiciability of the latter decision without showing, at least like in *Kaplan*, that the plaintiffs' new positions were sensitive.

The plaintiffs argue categorically that "*Egan's* holding is inapplicable to the BGAD Commander's barring the plaintiffs' access to BGAD as a result of the criminal investigation which resulted in a refusal to prosecute by the U.S. Attorney's Office."  [Record No. 7 at 6] The Court declines to adopt the plaintiffs' position, but nonetheless will deny the motion to dismiss inasmuch as it relates to the plaintiffs' ten-day suspension, barring the plaintiffs from BGAD and removing them from federal service.[9]

### b.    Compensatory Damages and Jury Trial

Finally, the Court considers the availability of compensatory damages and trial by jury. The caselaw on these issues is clear.  The Age Discrimination in Employment Act "provides no compensation for any of the other traditional harms associated with personal injury. Monetary remedies under the ADEA are limited to back wages, which are clearly of an

---

[9]      The defendants have not argued alternatively (other than pursuant to *Egan*) why claims regarding the plaintiffs' removal from service should be dismissed.  Therefore, Count II may go forward as mentioned, whatever its merit.

'economic character,' and liquidated damages, which . . . serve no compensatory function." *C.I.R. v. Schleier*, 515 U.S. 323, 336 (1995). In 1991 "Congress specifically amended Title VII to permit the recovery of compensatory damages, while notably making no such change to the ADEA." *Kulling v. Grinders for Indus., Inc*., 115 F. Supp. 2d 828, 846 (E.D. Mich. 2000).

On this much, the parties are in agreement. The plaintiffs may not recover for compensatory damages such as "embarrassment, humiliation and mental anguish." [Record No. 7 at 2] To the extent the Verified Complaint can be read as demanding such damages, those claims will be dismissed.

The parties remain opposed on the plaintiffs' right to a jury trial. No jury trial right exists for claims brought against the United States under the ADEA. The Supreme Court decided as much in *Lehman v. Nakshian*, 453 U.S. 156, 168 (1981) ("Neither the provision for federal employer cases to be brought in district courts rather than the Court of Claims, nor the use of the word 'legal' in that section, evinces a congressional intent that ADEA plaintiffs who proceed to trial against the Federal Government may do so before a jury."). To the extent that *Lehman* was abrogated by the 1991 amendments to Title VII (which permitted a jury trial demand where compensatory and punitive damages are sought), the amendments did not apply to ADEA. Such damages remain unavailable in an action under the ADEA. Therefore, a jury trial is not available.

The plaintiffs cite *Imwalle v. Reliance Medical Products*, Inc., 515 F.3d 531 (6th Cir. 2008), as contrary authority. [Record No. 7 at 2] *Imwalle* is inapposite because the United States was not a defendant. *See Lehman*, 453 U.S. at 168 ("Congress expressly provided for jury trials in the section of the [ADEA] applicable to private-sector employers, and to state and

local governmental entities."). To be sure, where the defendant is an agency created by Congress and given the right to "sue and be sued," Courts have found a jury trial demand available. *See, e.g., Skymont Farms v. Fed. Crop Ins. Corp.*, No. 4:09-CV-65, 2010 WL 11484378 (E.D. Tenn. June 29, 2010) (permitting suit against Federal Deposit Insurance Corporation). But the plaintiffs' point to no express waiver regarding the United States Army. Therefore, the demand for a trial by jury will be dismissed.

## IV.    Conclusion

The Secretary of the Army has shown that decisions to certify participation in the AA&E program are analogous to the security clearance decision in *Egan*, such that the *Egan* doctrine bars adjudication of those decisions. However, the Army has not provided sufficient detail to show that the decisions: (i) to temporarily suspend the plaintiffs' from federal service and (ii) the later decisions to indefinitely suspend and ultimately remove the plaintiffs from federal service are non-justiciable under *Egan*. Finally, because Congress has not provided compensatory damages under the ADEA or waived sovereign immunity for purposes of jury trials under the ADEA, neither remedy is available to the plaintiffs. Accordingly, it is hereby

**ORDERED** that the Defendant Secretary of the Army's motion to dismiss [Record No. 6] is **GRANTED**, in part, and **DENIED**, in part, as follows:

a)    The plaintiffs' claims against Defendants Lee G. Hudson, Stephen L. Sharp, Christopher L. Willoughby, and Donald McKeehan are **DISMISSED**, with prejudice.

b)    The plaintiffs' claims in Count II are **DISMISSED** to the extent they are based on the plaintiffs' removal from the AA&E program.

c)    The plaintiffs' demand for compensatory damages is **DISMISSED**.

d)    The plaintiffs' demand for a trial by jury is **DISMISSED**.

This 14th day of August, 2017.

 Signed By:

*Danny C. Reeves* DCR

**United States District Judge**